IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                          Case No. 8:01-bk-09988-MGW
                                                Chapter 7
Terri L. Steffen,

        Debtor.

_____/

Douglas N. Menchise,                            Adv. Pro. No. 09-ap-00093-MGW
Chapter 7 Trustee,

        Plaintiff,

v.

Terri L. Steffen, Paul Bilzerian,
Overseas Holding Limited Partnership,
Guerrini Family Limited Partnership,
Guerrini Corporation, Guerrini Family
Corporation, Keyapaha Family Trust,
Keyapaha Company, Daer Holdings, LLC,
Deborah Meshulam, as Receiver, and
The U.S. Securities and Exchange
Commission,

        Defendants.

_____/

**MEMORANDUM OPINION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

     The Trustee and the Internal Revenue Service seek a declaration that property

previously owned by the Debtor remains property of the estate as a matter of law even

though it has been transferred twice—first to Guerrini Family Limited Partnership

("GFLP") and later to Daer Holdings, LLC ("Daer")—as part of two court-approved

sales in two different bankruptcy cases. They claim both transfers were ineffective

because the property was transferred to the Debtor's nominees: GFLP and Daer. The IRS, which has a federal tax lien on the property, also seeks a declaration that Iberiabank's mortgage lien—the only other lien on the property—is void as matter of law because Iberiabank's predecessor-in-interest recorded the mortgage lien in violation of the automatic stay and had knowledge—either actual or constructive—that the property securing its mortgage was property of the estate.

Daer and Iberiabank, of course, dispute that GFLP and Daer are the Debtor's nominees. But in any event, Daer and Iberiabank claim the IRS is barred by the doctrines of res judicata and collateral estoppel from undoing the Court's prior sale orders. Iberiabank also claims that the automatic stay did not preclude its predecessor from recording its mortgage lien and that its valid mortgage lien is superior to the IRS's federal tax lien under the Internal Revenue Code.

All of the parties are bound by the Court's prior sale orders regardless of whether they were a party to—or had notice of—the sale proceeding. That is because bankruptcy sales are final as to the entire world. Nevertheless, the property at issue remains property of the estate subject to administration by the Trustee notwithstanding the transfers because Daer is the Debtor's nominee, and the Debtor's estate retains an equitable interest in property held by a debtor's nominee. The property, however, is subject to Iberiabank's mortgage lien, which is superior to the IRS's federal tax lien under Internal Revenue Code § 6323. The IRS's federal tax lien, in turn, is entitled to be paid under the priority established in Bankruptcy Code § 724(b).

## Factual Background

### *The Consent Judgment*

The Debtor and her husband (Paul Bilzerian) previously owned a mansion located at 16229 Villarreal de Avila, Tampa, Florida. In March 1997, the Debtor and her husband transferred the Villareal mansion to Overseas Holding Limited Partnership ("OHLP") (the Debtor owned a 100% beneficial interest in OHLP). Nearly four years later, a federal district court in Washington, D.C. appointed a receiver over Bilzerian's assets to execute on a final judgment the Securities and Exchange Commission had previously obtained against Bilzerian requiring him to disgorge $60 million in illegal profits and accrued interest.[1] The receiver claimed that the Villareal mansion was part of Bilzerian's receivership estate.

The Debtor and OHLP intervened in the D.C. district court action to preserve their alleged interest in the Villareal mansion. Shortly after intervening in that action, the Debtor filed her bankruptcy case in this Court. In order to continue participating in the D.C. district court action, the Debtor was required to, and in fact did, obtain interim stay relief from this Court.[2] The parties in the D.C. district court action eventually agreed to a resolution of the dispute over their respective ownership interests in the Villareal mansion.

---

[1] Adv. Doc. Nos. 119-7 & 119-8.

[2] Doc. Nos. 12 & 14.

That agreement provided that (i) the Debtor (or OHLP) and the Bilzerian receivership each owned a 50% interest in the Villareal mansion; and (ii) the Villareal mansion would be sold, with the Debtor (or OHLP) receiving 50% of the sales proceeds and Bilzerian's receivership estate receiving the remaining 50% of the sales proceeds. The parties entered into a consent agreement memorializing those terms.[3] The D.C. district court ultimately entered a final judgment incorporating the terms of the parties' Consent Agreement.[4]

On January 25, 2002, this Court entered a final stay relief order. That order specifically provided that the "automatic stay, to the extent applicable, is expressly lifted and annulled to permit the entry of [the Consent Judgment] and the implementation thereof."[5] The IRS received notice of the parties' joint motion for stay relief,[6] the Consent Judgment,[7] and the final stay relief order (which incorporated the Consent Judgment).[8] The IRS also participated in the D.C. district court action. At no point, however, did the IRS object to the entry of the final stay relief order incorporating the Consent Judgment.

---

[3] *See* Consent & Undertakings by Terri L. Steffen, Overseas Holding Limited Partnership, Overseas Holding Co., Bicoastal Holding Co., Loving Spirit Foundation, Puma Foundation, and Paul A. Bilzerian & Terri L. Steffen 1994 Irrevocable Trust (the "Consent Agreement"). Adv. Doc. No. 210-14.

[4] Adv. Doc. No. 210-13 (the "Consent Judgment").

[5] Doc. No. 35.

[6] Doc. No. 12.

[7] Adv. Doc. No. 210-13 at p. 2; Adv. Doc. No. 210-20.

[8] Doc. No. 35.

*GFLP and the GFLP Sales Contract*

For more than a year after entry of the Consent Judgment, the marketing of the Villareal mansion was under the supervision and control of the SEC receiver. Then, on March 31, 2004, the Debtor (as president and general partner of OHLP), with the consent of the SEC receiver, contracted with GFLP to sell the Villareal mansion to GFLP for $2.25 million. GFLP apparently was formed to acquire the Villareal mansion. Its general partner was the Guerrini Corporation, which was controlled by Mary Haire (the Debtor's next-door neighbor). The Guerrini Corporation owned a 1% interest in GFLP. The remaining 99% interest was owned by the Guerrini Family Corporation, which was controlled by the Debtor's parents. The Guerrini Family Corporation later purportedly transferred its 99% interest in GFLP to the Keyapaha Family Trust, another entity controlled by the Debtor's parents.

*The Sale Notice*

Once the SEC receiver approved the sales contract, the Debtor filed a notice of sale in her bankruptcy case on April 14, 2004.[9] The notice of sale, which was served on the IRS, attached a copy of the contract between OHLP and GFLP; however, GFLP's name was redacted from the contract. The notice also failed to include any date for objecting to the proposed sale. Instead, the notice specifically provided that it was "given for informational purposes" only since the sale of the Villareal mansion was controlled

---

[9] Doc. No. 260.

by the Consent Judgment and this Court's final stay relief order incorporating the

Consent Judgment.[10]

*The Sale to GFLP*

In any event, no objections to the sale notice were filed. So the property was sold

to GFLP on May 10, 2004. GFLP financed the purchase of the Villareal mansion through

SouthTrust Mortgage Corporation. SouthTrust later assigned the mortgage to Wachovia

Bank. Mary Haire personally guaranteed the $2.25 million mortgage loan.

*The Involuntary Bankruptcy*

GFLP originally purchased the Villareal mansion with the intention of selling it

after one year. But GFLP claims that the Debtor and Bilzerian interfered with any

proposed sale so that they could continue residing at the mansion. Unable to come to any

agreement with the Debtor and Bilzerian over the marketing or sale of the mansion,

GFLP demanded that they vacate the property. In response, the Keyapaha Family Trust

and the Guerrini Family Corporation filed a state court action seeking dissolution of

GFLP and sale of the Villareal mansion. The Keyapaha Family Trust requested that the

state court appoint Michael Peters as a receiver for the mansion.

The state court declined, instead appointing Maynard Luetgert as receiver.

Luetgert held an auction on April 27, 2006, and the successful bidder was Daer. That sale

was unable to close, however, because of title insurance issues. Daer later sued to recover

its deposit. The state court ultimately entered an order ejecting the Debtor and Bilzerian

from the Villareal mansion. One week later, the Keyapaha Company (as trustee for the

---

[10] Doc. 260 at p. 1.

Keyapaha Family Trust) initiated an involuntary petition against GLFP in this Court.[11]

GFLP consented to the involuntary petition.[12]

*Daer and the Sale Auction*

At the time of the involuntary bankruptcy, GFLP's primary asset was the Villareal

mansion. Consequently, three weeks after the involuntary petition was filed, GFLP

sought Court approval of proposed bid procedures for the sale of the Villareal mansion.[13]

On November 22, 2006, the Court entered an order preliminarily approving a "stalking

horse contract" and scheduling the sale of the Villareal mansion for December 11,

2006.[14] The Court's November 22 order also established procedures for marketing and

auctioning the Villareal mansion. Among those procedures was a requirement that any

initial bid for the Villareal mansion exceed the "stalking horse contract" by $200,000.

The sale auction was held on December 11, 2006. And the highest bid—$5.5

million—was submitted by Daer. Daer had been formed over a year earlier by David

Slavinksy for the purpose of buying real estate. At the time Daer was formed, Slavinsky

was its sole member. Slavinsky later sold his membership interest in Daer to his father-

in-law, Michael Peters. Daer was originally managed by Peters and Slavinksy. Then, in

mid-2010, Scott Rohleder replaced Slavinksy as a managing member. Peters eventually

resigned, leaving Rohleder as Daer's sole managing member.

---

[11] *In re Guerrini Family Limited Partnership*, Case No. 8:06-bk-05383-MGW.

[12] Guerrini Doc. No. 43.

[13] Guerrini Doc. No. 35.

[14] Guerrini Doc. No. 117.

*The Daer Sale Order*

On December 15, 2006, the Court entered a final sale order (i) finding, among

other things, that Daer acted in "good faith" within the meaning of Bankruptcy Code §

363; and (ii) authorizing GFLP to convey the Villareal mansion to Daer.[15] Daer closed on

the sale of the Villareal mansion on December 27, 2006. The funds for the $327,000

deposit came from the Puma Foundation, an entity owned by the Debtor. Daer financed

the balance of the $5.5 million purchase price through Century Bank. Michael Peters

personally guaranteed the loan. Daer granted Century Bank a mortgage on the Villareal

mansion to secure its obligation to repay the loan. Daer later executed and delivered to

Century Bank a second promissory note in the principal amount of $750,000. Daer also

granted Century Bank a second mortgage to secure its obligations under the second

promissory note.

*Iberiabank's Acquisition of the Daer Loans*

Century Bank later was placed in receivership, and on November 13, 2009,

Iberiabank acquired some of Century Bank's assets, including the loans to Daer, from the

Federal Deposit Insurance Company.

*The Debtor's Access and Use of the Villareal Mansion*

At the time of the closing of the 2006 sale to Daer, the Debtor and Bilzerian were

living at the Villareal mansion. In fact, the Debtor and Bilzerian had continued to reside

at the mansion even after it was sold to GFLP. When the mansion was sold to Daer, both

the Debtor and Bilzerian executed an agreement to vacate the Villareal mansion no later

---

[15] Guerrini Doc. No. 225 at p. 4.

than the closing date. But after the closing, Daer claims it hired the Debtor to continue managing and maintaining the Villareal mansion and permitted her to stay at the Villareal mansion rent free so she could fulfill those responsibilities. The Debtor and her husband have had access to the Villareal mansion every day since Daer acquired it. The utility bills for the Villareal mansion remain in the Debtor and Bilzerian's names. And they both continue to list the Villareal mansion as their address of record on various other bills, including at least one personal credit card.

**Procedural Background**

On February 23, 2009, the Trustee filed this adversary proceeding seeking (i) a declaration that the Villareal mansion is property of the estate, that it was never transferred to an arms-length purchaser, and that Daer is the Debtor's alter ego (Counts I, VI, and VIII); (ii) turnover of the Villareal mansion to the Trustee (Counts II and III); (iii) to avoid the transfer of the Villareal mansion (Count IV); (iv) to recover the value of the Villareal mansion under Bankruptcy Code § 550 (Count V); and (v) to vacate the Court's prior sale orders based on fraud (Count VII).[16] Daer moved to dismiss the Trustee's adversary complaint.[17] Judge Paskay dismissed all of the claims against Daer (all but one of which without prejudice), except the counts seeking a declaration that the Villareal mansion is property of the estate and that Daer is an alter ego of the Debtor (Counts I and VIII).[18] The IRS later intervened in this action seeking a declaration that (i)

---

[16] Adv. Doc. No. 12. The Trustee originally filed this proceeding on February 3, 2009. He later amended his adversary complaint on March 9, 2009. Adv. Doc. No. 12.

[17] Adv. Doc. No. 33.

[18] Adv. Doc. No. 44.

the Villareal mansion is property of the estate and that the transfers of the Villareal

mansion to GFLP and Daer were ineffective (Count I); and (iii) Iberiabank's lien is void

(Count II).[19]

Daer initially moved for summary judgment against the Trustee and IRS on their

claims.[20] Iberiabank likewise moved for summary judgment on the IRS's claims.[21] The

IRS, of course, opposed those motions.[22] The Court heard the parties' summary judgment

motions on September 27, 2011 and ultimately took them under advisement at the

conclusion of the hearing. Shortly after the September 27 summary judgment hearing, the

IRS filed its own summary judgment motion.[23] Daer and Iberiabank oppose the IRS's

summary judgment motion.[24] The Court now has all three summary judgment motions

before it.

## Issues

The parties have engaged in lengthy discovery and filed hundreds of pages of

legal memoranda and thousands of pages of exhibits in support of and opposition to the

various summary judgment motions. Notwithstanding all of that, resolution of the

respective summary judgment motions comes down to three issues: First, is the IRS

---

[19] Adv. Doc. No. 168. The IRS originally filed its intervention complaint on February 8, 2011. Adv. Doc. No. 145. The IRS later amended its intervention complaint on April 8, 2011. Adv. Doc. No. 168.

[20] Adv. Doc. Nos. 102 & 201.

[21] Adv. Doc. No. 225.

[22] Adv. Doc. Nos. 210 & 238.

[23] Adv. Doc. No. 267.

[24] Adv. Doc. Nos. 299, 306 & 434.

bound by the Court's prior sale orders? Second, are GFLP and Daer the Debtor's nominees, and if so, does the Villareal mansion remain property of the estate even in light of the prior sale orders? Third, assuming the Villareal mansion remains property of the estate, is Iberiabank's mortgage lien valid and does it have priority over the IRS's federal tax lien?

## Conclusions of Law

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (F), (H), (K), (M), (N) & (O).

### *The IRS is Bound by the Court's Earlier Sale Orders*

The parties spend a significant amount of time arguing whether the IRS was party to—or had notice of—either of the Court's prior sale orders. The IRS, in particular, argues that it was not party to the Consent Judgment in the D.C. district court litigation and that it did not receive adequate notice of either sale. It is undisputed, however, that the IRS received notice of (i) the parties' joint motion for stay relief;[25] (ii) the Consent Judgment in the D.C. district court litigation;[26] and (iii) the final stay relief order (which incorporated the Consent Judgment).[27]

---

[25] Doc. No. 12.

[26] Adv. Doc. No. 210-13 at p. 2; Adv. Doc. No. 210-20.

[27] Doc. No. 35.

More importantly, it is undisputed that the IRS received notice of the Debtor's April 14, 2004 sale notice.[28] In fact, the IRS's lead trial counsel in this proceeding conceded that not only did the IRS receive a copy of the April 14 sale notice, but the sale notice was also served on her personally.[29] In the end, the IRS's claim of inadequate notice really boils down to the fact that GFLP's name was redacted from the sales contract attached to the April 14 sale notice. If that omission was important to the IRS, it could have—indeed it should have—raised that issue when it received the notice. But it did not.

In any event, the notice issue is not dispositive in this case. To be sure, the IRS is barred by the doctrines of res judicata and collateral estoppel from relitigating the sale order in the Debtor's bankruptcy case (or the facts raised in the sale motions) in a separate lawsuit because it had notice of the sale to GFLP. But the IRS is bound by the Court's prior sale orders (both the sale to GFLP and the sale to Daer) regardless of whether it was a party to—or had notice of—the sale motions.

That is because, as Judge Posner recognized in *In re Met-L-Wood Corporation*, a proceeding under Bankruptcy Code § 363 is an *in rem* proceeding.[30] An *in rem* proceeding "transfers property rights, and property rights are rights good against the world, not just against parties to a judgment or persons with notice of the proceeding."[31]

---

[28] Doc. No. 260.

[29] Adv. Doc. No. 437 at p. 46, l. 1 – p. 50, l. 3.

[30] *Gekas v. Pipin (In re Met-L-Wood Corp.)*, 861 F.2d 1012, 1017 (7th Cir. 1988).

[31] *Id.*

As a consequence, the IRS is bound by the Court's prior sale orders even if it was not a party to—or did not have notice of—the sale proceedings.

That, of course, does not mean the IRS has no avenue for challenging the Court's prior sale orders. It does; but the sole remedy for challenging those orders is under Federal Rule of Civil Procedure 60(b).[32] Rule 60(b) provides six grounds for relief from a final judgment: (i) mistake, inadvertence, surprise, or excusable neglect; (ii) newly discovered evidence; (iii) fraud, misrepresentation, or misconduct by an opposing party; (iv) the judgment is void; (v) the judgment has been satisfied, released, or discharged; or (vi) any other reason that justifies relief.[33]

Motions based on the first three grounds—mistake or excusable neglect; newly discovered evidence; and fraud—must be brought within one year after entry of the final judgment or order.[34] Because the Trustee's and IRS's claims in this action were more than four years after the latest sale order, none of those first three grounds provide a basis for relief. Nor do the fourth (the judgment is void) and fifth (the judgment has been satisfied, released, or discharged) grounds. The sale orders are not void. The only plausible reason they would be is if the IRS lacked notice. But, as discussed above, the IRS concedes it received the April 14, 2004 sale notice. True, it did not receive the sale notice in the GFLP case; however, it had no claim in that case. So the fourth ground

---

[32] Indeed, numerous courts have recognized that final sale orders can only be set aside under Rule 60(b). *See, e.g., In re Met-L-Wood Corp.*, 861 F.2d at 1018; *In re Edwards*, 962 F.2d 641, 643 (7th Cir. 1992).

[33] Fed. R. Civ. P. 60(b)(1)-(6).

[34] Fed. R. Civ. P. 60(c)(1) ("A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.")

provides no basis for relief. And the fifth ground obviously has no application here. That leaves Rule 60(b)'s "catch-all" provision.

The only plausible basis for relief from the judgment under the "catch-all" provision is that the Debtor essentially perpetrated a fraud on the Court by orchestrating the transfer of the Villareal mansion to two entities that were, unbeknownst to the Court and creditors, the Debtor's nominees. Fraud on the court, however, is not a basis for relief under Rule 60(b)'s "catch-all" provision. The "catch-all" only deals with grounds for relief not specifically enumerated in Rule 60(b)(1)-(5).[35] And fraud is specifically addressed in Rule 60(b)(3). Besides, the "catch-all" cannot be used to make an end-run around the one-year limitation.[36] So the IRS is not entitled to relief under Rule 60(b)'s "catch-all" provision based on fraud on the Court.

Another provision in Rule 60—subsection (d)—does provide for relief from a judgment where a party has perpetrated a fraud on the court.[37] The problem—at least from the IRS's perspective—is that the Debtor has not perpetrated a fraud on the Court here. Judge Posner addressed this very same issue in *In re Met-L-Wood Corporation*. There, certain creditors claimed they were entitled to relief from a final sale order under Rule 60(b) because the debtor's principal orchestrated a secret plan to use a shill bidder to acquire the debtor's assets and then transfer the profitable portion of those assets back

---

[35] Rule 60(b)(6), by its terms, is limited to "any other reason justifying relief from the operation of the judgment." *Id.*

[36] *In re Met-L-Wood Corp.*, 861 F.2d at 1018.

[37] Fed. R. Civ. P. 60(d)(3) ("This rule does not limit a court's power to . . . set aside a judgment for fraud on the court.")

to the debtor's principal, leaving the unsecured creditors holding the bag.[38] Judge Posner observed that the debtor's principal committed a fraud against the debtor's creditors by using "his control to walk off with [the debtor's] principal assets for a song, shucking off the unsecured creditors in the process."[39] But that did not, according to Judge Posner, constitute a fraud on the court.[40] The same is true in this case.

Ultimately, § 363 sales require finality. Otherwise, trustees or debtors-in-possession would never be able to obtain the maximum value for a debtor's assets. Accordingly, absent grounds for relief under Rule 60, a final sale order is binding even on those who were not party to—or did not have notice of—the sale motion. Because no grounds for relief under Rule 60(b) exist, the IRS is bound by the Court's earlier sale orders.

*The Debtor's Equitable Interest in the*
*Villareal Mansion Remains Property of the Estate*

Even though the IRS is bound by the Court's earlier sale orders, the Villareal mansion may still remain property of the estate. Under Bankruptcy Code § 541, property of the estate includes all of the debtor's equitable interest in any property. The Eleventh Circuit has recognized that a debtor retains an equitable interest in property held by the debtor's nominee.[41] Consequently, a debtor may legally transfer title to property to a third

---

[38] *In re Met-L-Wood Corp.*, 861 F.2d at 1015-16.

[39] *Id.* at 1019.

[40] *Id.*

[41] *Gurley v. Mills*, No. 99-13416, slip op. at 2-4 (11th Cir. 2000); *In re Gurley*, 357 B.R. 868, 872 (Bankr. M.D. Fla. 2006) (citing unpublished Eleventh Circuit Court of Appeals decision affirming bankruptcy

party, but if that third party is the debtor's nominee, then the debtor retains an equitable

interest in that property, and the debtor's equitable interest in the property is property of

the estate subject to administration by the trustee even though legal title has passed.

Critically, application of the "nominee" theory does not impact the validity of the

transfer of legal title to Daer. That transfer was effective. Nor does it somehow

undermine the finality of the Court's earlier sale orders. All of the parties were justified

in relying on the sale orders. And parties to a bankruptcy case or other interested persons

need not worry that § 363 orders may be undone years down the road. Rather, the unique

facts of this case present a discreet legal issue: does a debtor retain an equitable interest in

property held by a nominee (even where the nominee acquired legal title by a § 363

sale)—not whether the transfer to a nominee conveys legal title. The Eleventh Circuit

Court of Appeals has already concluded that a debtor does retain an equitable interest in

property held by a nominee.

The only question here is whether Daer is the Debtor's nominee. The "nominee"

theory frequently arises in taxpayer cases. And courts in those cases have developed a

test for determining whether a corporation is a taxpayer's nominee.[42] For instance, in

*Shades Ridge Holding Co. v. United States*, the Eleventh Circuit identified the following

factors for making that determination: (i) the control the taxpayer exercises over the

nominee and its assets; (ii) the family relationship, if any, between the taxpayer and the

corporate officers; and (iii) the use of corporate funds to pay the taxpayer's personal

court's ruling that the debtor retained an equitable interest in property in the hands of the debtor's nominee
(his wife)).

[42] *Shades Ridge Holding Co. v. United States*, 888 F.2d 725, 728 (11th Cir. 1989).

expenses.[43] The Court concludes that the *Shades Ridge* test is the appropriate test in this case.

And at first glance, it appears, based on the voluminous filings in this case, that there are a number of disputed material facts under that test. But a closer examination of the record reveals there are a number of undisputed material facts that, by themselves, establish that Daer is the Debtor's nominee as a matter of law under the *Shades Ridge* test, even viewing all of the remaining facts in the light most favorable to Daer.

First, there is no dispute that the Debtor exercises dominion and control over Daer's sole asset: the Villareal mansion. The Debtor lived in the Villareal mansion rent free after it was sold to GFLP. And she continued to reside there rent free at least half of the year (perhaps more) after it was sold to Daer. Daer concedes that the Debtor (along with her husband, mother, and nephew) has had access to the property every day since Daer closed on the sale and that the Debtor's mother and nephew have each occupied the Villareal mansion six months out of the year since December 2006.[44] In fact, the undisputed record evidence is the only occupants of the Villareal mansion between June 2006 and May 2010 were the Debtor, Bilzerian, the Debtor's mother, the Debtor's two sons, and the Debtor's nephew.

---

[43] *Id.* at 729.

[44] Adv. Doc. 245-2.

Apparently the only time the Debtor and her other family members were not permitted to reside at the mansion is when it is occupied by The Winner's Circle,[45] although even then it is not clear that the Debtor did not also occupy the mansion on those dates. In any event, Daer is only able to identify sixteen days that The Winner's Circle has occupied the mansion from December 26, 2006 through August 31, 2011.[46]

Daer claims the Debtor's use and control over the Villareal mansion does not demonstrate she is a nominee because she is really the property manager for Daer. Of course, that explanation is not particularly credible considering the Debtor does not receive any regular compensation for those services. But the Court need not—and, in fact, does not—assess the credibility of that evidence because whether or not the Debtor is the property manager does not change the fact that she exercises significant dominion and control over Daer's sole asset. The same was true when the Villareal mansion was titled in GFLP's name.

Second, there is a close familial relationship between the Debtor, on the one hand, and GFLP and Daer, on the other hand. Daer does not dispute, for instance, that the Debtor's parents were the principals of the Guerrini Family Corporation (GFLP's original 99% limited partner) and the Keyapaha Family Trust (later GFLP's 99% limited partner).

---

[45] Between 2008 and 2009, Bilzerian had a relationship with International Investors Group ("IIG"). IIG, in turn, had a relationship with The Winner's Circle. Bilzerian claims he has not had any relationship with The Winner's Circle—even indirectly—since May 2010. *Deposition Transcript of Paul Bilzerian*, Adv. Doc. No. 431-109 at p. 29, l. 21 – p. 30, l. 4 ("In 2008, 2009 and part of 2010—I think those dates are right—I was associated with International Investors Group, IIG, and it had a relationship with The Winner's Circle. So my relationship with The Winner's Circle was through IIG during that period of time.")

[46] Adv. Doc. 245-2.

Nor does Daer dispute that Keyapaha Family Trust—whose beneficiary is the Debtor's mother—made a $350,000 capital contribution to Daer in exchange for a 75% ownership interest in Daer less than one week before Daer closed on the sale of the mansion.

Third, there is no dispute that Daer periodically paid the Debtor's Citiadvantage and Discover card accounts from June 2007 through March 2009. Over that time, Daer paid charges totaling $90,569.06. Arguably, though, there is record evidence that suggests these payments were to reimburse the Debtor for expenses incurred in her capacity as a property manager. So, unlike the first two factors, the third factor does not conclusively favor a finding that Daer is the Debtor's nominee.

The third factor, however, is not determinative. The most critical issue is who has substantial control over the property—i.e., the first factor.[47] After all, the nominee theory "attempts to discern whether a taxpayer has engaged in a sort of legal fiction . . . by placing legal title to the property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner."[48] Even assuming the last factor does not support the IRS's nominee theory and that the facts identified in Daer and Iberiabank's supplemental response[49] are in dispute (or that they contradict the IRS's claims), it nevertheless remains undisputed that the Debtor has retained most of the benefits of

---

[47] *Shades Ridge*, 888 F.2d at 728 ("The issue under either state or federal law depends on who has 'active' or 'substantial' control."); *United States v. Todd*, 2008 WL 2199873, at *3 (M.D. Fla. 2008) (citing *In re Shades Ridge*, 888 F.2d 728)).

[48] *Richards v. United States (In re Richards)*, 231 B.R. 571, 578 (E.D. Pa. 1999).

[49] Adv. Doc. No. 434.

being the true owner—in particular, significant dominion and control over the Villareal

mansion.

Indeed, the Debtor and her husband use and occupy the Villareal mansion the

same today as they did when they owned it over fifteen years ago. And that fact, coupled

with the close relationship between the Debtor and Daer, establishes that Daer is the

Debtor's nominee as a matter of law.  Accordingly, the Debtor's equitable interest in the

Villareal mansion remains property of the estate subject to administration by the Trustee.

*Iberiabank's Mortgage Lien is Superior to the IRS's Federal Tax Lien*

The sole issue left for the Court to determine, then, is the validity and priority of

any liens on the Villareal mansion. There are really only two liens at issue: Iberiabank's

$5.5 million mortgage lien and the IRS's federal tax lien on the property. Federal tax

liens do not automatically have priority over all other liens.[50] Rather, the priority of

federal tax liens is, absent a statutory provision to the contrary, ordinarily governed by

the common-law principle that "the first in time is the first in right."[51]

But here there is a provision to the contrary: Internal Revenue Code § 6323. That

section provides that a federal tax lien imposed under § 6321 "shall not be valid as

against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien

creditor until notice thereof which the meets the requirements of subsection (f) has been

filed by the Secretary."[52] Since the IRS does not appear to dispute—nor could it—that

---

[50] *United States v. McDermott*, 507 U.S. 447, 449, 113 S. Ct. 1526, 1528, 123 L. Ed. 2d 128 (1993).

[51] *Id.*

[52] 26 U.S.C. § 6323(a); *see also United States v. Weissman*, 135 So. 2d 235, 237-38 (Fla. 2d DCA 1961) (holding that a lien for taxes is not valid against a "mortgagee," "pledgee," "purchaser," or "judgment

Iberiabank is the holder of a security interest by virtue of its mortgage liens on the Villareal mansion, Internal Revenue Code § 6323 applies here.

The United States Supreme Court has held that under § 6323 a federal tax lien commences no sooner than the filing of a notice under that section; a competing state-law lien—such as Iberiabank's mortgage lien—comes into existence for purposes of § 6323 when it has been "perfected."[53] There is no dispute in this case that the IRS had not filed any notice of its tax liens by the time Century Bank recorded its $5.5 million mortgage lien on December 28, 2006 and its $750,000 mortgage lien on March 28, 2008. Accordingly, Iberiabank's mortgage lien has priority over the IRS's federal tax lien under Internal Revenue Code § 6323.

As a consequence, the IRS is left to argue that Iberiabank's mortgage lien is void for two reasons. First, the IRS claims that Century Bank recorded its mortgage lien in violation of the automatic stay. Second, the IRS claims that for a variety reasons Century Bank knew or should have known that the Villareal mansion was property of the Debtor's estate.

It is true, as the IRS contends, that Bankruptcy Code § 362(a)(4) prohibits "any act to create, perfect, or enforce any lien against property of the estate."[54] Section 362(b)(24), however, provides that the automatic stay does not apply to any "transfer"

---

creditor," as those terms are used in their ordinary and accepted senses); *Manchester Fed. Sav. & Loan Ass'n v. Emery-Waterhouse Co.*, 153 A.2d 918, 921 (N.H. 1959).

[53] *McDermott*, 507 U.S. at 449, 113 S. Ct. at 1528.

[54] 11 U.S.C. § 362(a)(4).

that is not avoidable under Bankruptcy Code §§ 544 or 549.[55] The IRS appears to concede that the exception under Bankruptcy Code § 362(b)(24) applies if "perfecting" a mortgage lien was a "transfer." But, according to the IRS, it is not. The IRS claims Bankruptcy Code § 101(54)(A) only defines the "creation" of a lien—rather than the "perfection" of a lien—as a "transfer."

The IRS's argument is without merit. Bankruptcy Code § 101(54) "adopts an expansive definition of transfer" that includes "every mode . . . of disposing of or parting with property or with an interest in property."[56] The "perfection" of a lien constitutes a "transfer" under Bankruptcy Code §101(54)'s expansive definition.[57] So Iberiabank's mortgage lien is not void under Bankruptcy Code § 362 unless it can be avoided under Bankruptcy Code § 544 or 549.

Here, the IRS does not advance any argument that Iberiabank's mortgage lien can be avoided under either section. It is undisputed that Iberiabank's lien was properly perfected; consequently, it cannot be avoided under Bankruptcy Code § 544, the "strong-arm clause" that allows a trustee to avoid any unperfected security interest. Moreover, there is no dispute that Iberiabank's lien cannot be avoided under Bankruptcy Code § 549 because Iberiabank is a good-faith purchaser who paid present equivalent value for its mortgage lien without knowledge of the bankruptcy case. Since Iberiabank's lien cannot

---

[55] 11 U.S.C. § 362(b)(24).

[56] *Womack v. Houk (In re Bangert)*, 226 B.R. 892, 898 (Bankr. D. Mont. 1998); *Malloy v. St. John Med. Ctr. (In re Woodward)*, 234 B.R. 519, 525 (Bankr. N.D. Okla. 1999).

[57] *In re Woodward*, 234 B.R. at 525 (citing 2 *Collier on Bankruptcy*, ¶ 101.54[1] & [2] (15th ed. rev. 1999)).

be avoided under either Bankruptcy Code § 544 or 549, then the automatic stay did not

prohibit Iberiabank from recording that lien. Accordingly, Iberiabank's lien is not void

for that reason.

Nor is it void because Iberiabank was on actual or constructive notice that the

Villareal mansion was property of the estate. To begin with, it is undisputed that

Iberiabank did not have actual notice that the Villareal mansion was property of the

estate. And the *D'Oench Dhume* doctrine precludes the IRS from imputing constructive

knowledge of that fact to Iberiabank in this case. Under the *D'Oench Dhume* doctrine, the

FDIC's "interest in an asset it acquired from a failed bank could not be diminished by

alleged 'agreements' not disclosed in the failed bank's records."[58]

The *D'Oench Dhume* doctrine has since been codified at 12 U.S.C. §

1823(e)(1).[59] That section provides that no "agreement" that tends to diminish or defeat

the FDIC's interest in any asset it acquired from a failed institution is valid unless it: (i) is

in writing; (ii) was executed by the depository institution and any person claiming an

adverse interest to the depository institution; (iii) was approved by the depository

institution's board of directors or loan committee and reflected in the meeting minutes;

and (iv) has been maintained continuously as an official record of the depository

institution since the agreement's execution.[60] Importantly, the *D'Oench Dhume* doctrine

has been expanded in two critical respects.

---

[58] *First Union Nat'l Bank of Florida v. Hall*, 123 F.3d 1374, 1379 (11th Cir. 1997).

[59] *Hall*, 123 F.3d at 1379 n.9.

[60] 11 U.S.C. § 1823(e)(1)(A)-(D).

First, it has been expanded to "protect entities to whom the FDIC, acting in its capacity as receiver of failed banks, has transferred assets formerly belonging to a failed bank."[61] Second, it has been expanded to preclude a party from relying not only on "agreements, schemes, or arrangements, but on any claim or defense that would tend to deceive banking authorities as to the value of the insolvent bank's assets."[62] Under this expanded *D'Oench Dhume* doctrine, Iberiabank's mortgage lien cannot be invalidated based on Century Bank's constructive—or, for that matter, actual—knowledge that the Villareal mansion may be property of the estate unless that knowledge is reflected in a written agreement maintained in Century Bank's records.[63] And it is undisputed there is no such writing.

Iberiabank, therefore, has a valid mortgage lien on the Villareal mansion. And that lien is superior to the IRS's federal tax lien under Internal Revenue Code § 6323 because Iberiabank is the holder of a security interest that was perfected before the IRS filed notice of its tax lien. So where does that leave the IRS? The answer to that question lies in Bankruptcy Code § 724.

---

[61] *Hall*, 123 F.3d at 1379 n.8.

[62] *Jobin v. Resolution Trust Co.*, 160 B.R. 161, 166 (D. Col. 1993).

[63] *Jobin*, 160 B.R. at 171 (holding that "[e]ven if the Trustee could establish that officers at Old Cap Fed were aware of M&L's illegal activities, the institution's knowledge of the Ponzi scheme cannot bar the RTC's defenses under *D'Oench Dhume* and § 1823 unless it is reflected in a written understanding"); *Demakes Enter., Inc. v. FDIC (In re Demakes Enter., Inc.)*, 143 B.R. 304, 309 (Bankr. D. Mass. 1992) (holding that evidence of institution's inequitable conduct must be based on failed bank's records to support equitable subordination claim); *FDIC v. Figge (In re Figge)*, 94 B.R. 654, 667-69 (Bankr. C.D. Cal. 1988) (holding that evidence that bank president knew of borrowers' scheme to violate federal banking regulations barred under *D'Oench*).

Bankruptcy Code § 724 provides a mechanism for subordinating certain tax claims to the payment of certain priority claims.[64] But it does not affect liens that are junior or senior to the tax lien.[65] Specifically, Bankruptcy Code § 724(b) provides that the proceeds from the sale of estate property that secures an allowed claim for unpaid paid income taxes shall be paid (i) first, to the holder of an allowed claim secured by a lien on the property that is not avoidable and that is senior to the tax lien; (ii) second, to the holders of any allowed priority claims under Bankruptcy Code § 507(a)(1)-(7) (subject to certain exceptions) to the extent of the amount of the allowed tax claim secured by the tax lien; (iii) third, to the holder of such tax lien to the extent that the allowed tax claim secured by the lien exceeds the amount distributed to priority claimants; (iv) fourth, to any holder of an allowed claim secured by a lien on the property that is not avoidable and junior to the tax lien; (v) fifth, to the holder of the tax claim to the extent not already paid; and (vi) sixth, to the estate.[66] The IRS is entitled to be paid on its federal tax lien consistent with Bankruptcy Code § 724(b).

## Conclusion

For the reasons set forth above, all of the parties are bound by the Court's prior sale orders. Nevertheless, the Villareal mansion remains property of the estate subject to Iberiabank's first priority mortgage lien and the IRS's federal tax lien (which shall be

---

[64] 11 U.S.C. § 724(b)(1)-(6).

[65] *Id.*

[66] *Id.*

paid under Bankruptcy Code § 724(b)). The Court will enter a separate order on the

parties' cross-motions for summary judgment consistent with this Memorandum Opinion.

**DATED** in Chambers at Tampa, Florida, on _____January 04, 2012_____.


_____

Michael G. Williamson
United States Bankruptcy Judge

Copies to:

**Debtor**
**Paul Bilzerian**
**Michael Markham, Esq.**, Johnson Pope Boor Ruppel & Burns, LLP, Counsel for the
    Trustee
**Mary Apostolakos Hervey, Esq.**, United States Department of Justice, Counsel for the
    United States
**Darren Farfante, Esq.**, Fowler White Boggs, P.A., Counsel for Daer Holdings, LLC
**John D. Emmanuel, Esq.**, Fowler White Boggs, P.A., Counsel for Iberiabank
**John J. Lamoureux, Esq.**, Carlton Fields, P.A., Counsel for Iberiabank